UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ROSANNE GAUNY, | ) | Civil Action No.: 4:06-504-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| JOHN E. POTTER, Postmaster General, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case.  The Plaintiff alleges causes of action for sexual harassment / hostile work environment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  Presently before the Court is Defendant's Motion for Summary Judgment (Document # 33).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

## II.    FACTUAL HISTORY

### A.    Plaintiff's Position, Supervisors, and Co-workers

Plaintiff, a female, was referred by a friend, Jim Owens, to the United States Postal Service ("USPS") to interview for a temporary position.  Plaintiff interviewed in person with Ted Miller, a male, employed by the USPS as a Quality Specialist.  Id. at 12; Miller

_____

[1] Plaintiff's Deposition is located in two parts in the record.  See Document #33, Part 16 (Ex.14 to Defendant's Motion (Volume I pp.1-87)) and Document #35 (Volume II pp. 88-185).

Supp. Aff. at 13.[2]  In May of 2000, approximately one week after the interview, Ted Miller advised

the Plaintiff that he would hire her and that she needed to contact Adecco to complete the necessary

paperwork, which she did.  Plaintiff Dep. at 13, 31.  In August of 2000, Plaintiff along with two

other test directors went to Santa Ana, California to be trained on the new RCS equipment.  Plaintiff

Dep. at 24.  Ted Miller conducted the training, and Mark Hoffman was present at the training.  Id.

at 24, 30.  Plaintiff learned that if she worked a job for Miller she would earn $20 per hour and if she

worked a job for Hoffman she would earn $15 per hour.  Plaintiff Dep. at 30-31.  Miller and

Hoffman, both employees with the USPS, determined whether Plaintiff would work on certain jobs.

Id.  Throughout her employment with Adecco, Plaintiff worked on several jobs where Hoffman was

her supervisor and on several jobs where Miller was her supervisor.  Plaintiff was free to work on

jobs for Hoffman when Miller did not require Plaintiff for his jobs.  Id. at 30.  Miller was responsible

for assigning test directors to various postal facilities for RCS robot testing and ensuring that tests

were conducted according to procedures.  Miller Supp. Aff. at 13.

Adecco contracts with the USPS to provide temporary personnel to work at various USPS

sites.  Miller Supp. Aff. at 15.  About 100 Adecco personnel are assigned to the Postal Service for

automation programs including the Robotics Containerization System ("RCS") program.  Id. at 71.

RCS is a large robot manufactured by ABB Flexible Automation, Inc., and the robot is designed to

load postal containers with trays of mail.  RCS robots were going to be installed at major processing

facilities across the country.  After ABB installed the RCS robot in approximately eighty (80)

locations, one or two quality test directors would travel to the site to conduct quality testing of the

_____

[2] Miller's Supplemental Affidavit is located in two parts in the record.  See Document #33,
Part 2 (Ex.1 to Defendant's Motion (pp.13-47)) and Part 4 (Ex.3 to Defendant's Motion (pp. 69-71)).

-2-

newly installed machine. Plaintiff Dep. at 38, 44. The testing could last several weeks, and the test directors would usually stay in a hotel near the test location, have meals together, and share a rental car. Plaintiff Dep. at 113. Work as a quality test director was sporadic in that the person may work on a site for several weeks and then have several weeks with no work. Id. at 31. Usually in between working on USPS sites, the USPS supervisors would telephone the quality test directors at home to request them to fly to the next site on a certain date. Hoffman often called all of his employees (Adecco contractors) after hours because there were business questions that he needed answered. Hoffman Aff. At ¶ 7.[3] Quality test directors were verbally informed *not* to fraternize with ABB contractors. Plaintiff Dep. at 141-44. The quality test directors tested the ABB contractors' machines so fraternizing could be a potential conflict of interest. Id.

Careen[4] Hunt was Plaintiff's contact person at Adecco. Plaintiff Dep. at 34. Hunt is the person that telephoned the Plaintiff on February 24, 2001, to advise the Plaintiff that her employment on the RCS contract would cease on March 12, 2001. Id. at 51-52. The Plaintiff had believed that the Adecco job would last for two years. Plaintiff Aff. at ¶ 1.[5] The RCS program was completed in 2002. Miller Supp. Aff. at pp.15-16.

Plaintiff's co-workers included other test directors. Jim Owens, who referred Plaintiff to interview for the job, held the same job with Adecco as a quality test director. Bob Ruel and George Swank, who also held that same job position, came on board to work at USPS facilities testing the RCS robot in October of 2000. Plaintiff Dep. at 37, 103, 176. The Plaintiff participated in training

---

[3] Hoffman's Affidavit is located at Document #41, Part 7 (Ex.6 to Plaintiff's Response).

[4] In several places, her name is mis-spelled as "Karen."

[5] Plaintiff's Affidavit is located at Document #41, Part 6 (Ex. 5 to Plaintiff's Response).

Bob Ruel. Id. at 103-04. Tina King was employed as Ted Miller's assistant, and Sammy Seals was Ted Miller's supervisor. Plaintiff denies having any sexual relationship with Mark Hoffman, Jim Owens, ABB contractors, or anybody with which she worked. Plaintiff Dep. at 181-82. As of November 2004, Jim Owens still worked for Adecco on Miller's programs, and Swank and Ruel had transferred to other programs. Miller Supp. Aff. at p.16. Jim Owens had been reprimanded by Miller for fraternizing with contractors due to Owens' golfing and horse back riding with contractors and having them to his house for barbeque. Plaintiff Dep. at 138.

**B. Alleged Sexual Harassment by Ted Miller**

In May of 2000, during the Plaintiff's initial interview with Ted Miller, Miller asked the Plaintiff if she was married and if she had a boyfriend. Plaintiff Dep. at 12-13. Plaintiff answered "no" to both questions. Id. After the training period, on or about August 17, 2000, the Plaintiff's first job where Ted Miller was present was in Santa Ana, California. The night before the job was completed, Miller telephoned the Plaintiff in her hotel room to tell her he thought that the job had gone pretty well and he asked her to come to his hotel room and unwind. Plaintiff Dep. at 112-114. The Plaintiff told Miller "no" that it was not proper. Id. The next day, Miller and Plaintiff had lunch together. Miller told the Plaintiff that his wife had gained a lot of weight, they had not had sexual relations in a while ("how he wasn't getting any"), that he was very frustrated, and that his wife kept leaving him. Id. at 59, 112-114. The Plaintiff told Miller she was uncomfortable with him talking about that subject matter and to stop discussing it. Id. at 112-114.

Several months later on or about November 27, 2000, the Plaintiff worked on a job site in Cincinnati, Ohio, with Miller and Bob Ruel. Id. at 45-46. The Friday night after the job was completed, Miller telephoned the Plaintiff in her hotel room. Miller told her that she and Ruel did

a good job, and he invited her to come to his room to watch a movie, have some wine, and get to

know each other better. Id. at 118-19. The Plaintiff told Miller no -- that she did not date married

men and that she did not date men she worked with. Id. Miller said to Plaintiff "nobody will know"

and that he just wanted to get to know her better. Id. Plaintiff said no again. Id.

During the week of January 15, 2001, the Plaintiff worked at a site in Jacksonville, Florida,

at Miller's request. Id. at 120. After the job was done, that Friday night,[6] Miller telephoned Plaintiff

in her hotel room and invited her to come to his room to have some wine and that he still wanted to

get to know her better. Id. at 127. Plaintiff told Miller "no" again and stated words to the effect of

"you did this in Cincinnati, I told you no then, I don't like it" and then she hung up. Id. at 127-28.

The next morning Miller acted upset and cold and would not talk. Id. at 128-29.

Miller never touched the Plaintiff inappropriately nor did Miller touch her in any way that

offended her. Id. at 147-48. Once when Jim Owens and Plaintiff hugged because they were good

friends, Miller said "oh, I like hugs" and that made the Plaintiff feel uncomfortable. Id. at 149.

At least once a month, in between jobs, Miller would telephone the Plaintiff at her home.

Miller would say the call was a "courtesy call" and he would ask her how she was doing. Id. at 56-

62, 98. The telephone calls would include Miller's comments about his poor relationship with his

wife, his unhappiness, and his sexual frustrations. Id. at 56-62, 99; Plaintiff Aff. ¶ 9. Several times,

Miller said that his wife had left him again and that he and his wife had not had sex in a long time.

Plaintiff Aff. at ¶ 9. He further stated that he was about to explode. Id. During one phone call,

Miller told the Plaintiff that he had been working out in his basement and was hot and sweaty and

---

[6] According to a United States' calendar from 2001, January 19, 2001, was the Friday of the
week of January 15, 2001. See Google "time and date.com."

-5-

was going to have to take a shower.  Plaintiff Dep. at 56, 98-99.  Plaintiff felt uncomfortable when Miller discussed his not having sexual relations with his wife.  Id. at 101.

###     C.     Alleged Harassment by Daving

The Plaintiff had given her business card to an ABB contractor, Gerhart Daving, on one job site.  Plaintiff Dep. at 125.  In an inappropriate manner, Daving began emailing the Plaintiff and then calling her cellular telephone.  Id. at 124-26.  Plaintiff verbally complained to Miller about this in January of 2001, and she asked Miller to do something to make Daving cease contacting her.  Miller told Plaintiff that "he'll take care of it, and he took care of it."  Id. at 126.  Miller contacted Robert Marshall to report the incident, and Marshall was going to contact ABB about the incident.  Ex.1, Defendant's Motion (emails at p.28).  Marshall instructed Miller to ensure that Plaintiff was safe and that she should not go to the job site that evening if she in any way felt threatened.  Id.

###     D.     Plaintiff's Job Performance

Adecco would have conducted any performance evaluations of the Plaintiff.  Miller Supp. Aff. at p.15.  No performance evaluations are in the record.  Miller told the Plaintiff during telephone conversations and in-person on job sites that she was doing an excellent job and that he enjoyed having her on the team.  Plaintiff Dep. at 62, 102.  In October of 2000, while Plaintiff was helping train Bob Ruel, Miller told the Plaintiff that she was doing a good job training Ruel.  Plaintiff Dep. at 103-04.  In December of 2000, the test directors and Miller attended a meeting in Washington, D.C.  Plaintiff Dep. at 95.  Plaintiff, Miller, and Jim Owens were riding in one car, and Miller informed Plaintiff and Owens that there would be some layoffs.  Id.  Miller told Plaintiff and Owens that because they had been with the robot team since Day One, they would not be affected.  Id.  At the end of January 2001 or beginning of February 2001, Miller telephoned Plaintiff at her house;

-6-

Miller advised her that she did a great job in Jacksonville, Florida and that his wife had left but that she was coming back and they were going to try to work out their marriage.  Id. at 110-11.  On two occasions, Miller telephoned the Plaintiff at the last minute to request that she work on job sites, and the Plaintiff dropped her planned vacation in October of 2000 to travel to Lansing, Michigan, and she worked right before Christmas in 2000 in Daytona, Florida.  Plaintiff Dep. at 36-37, 48.  Miller thanked the Plaintiff for working jobs at the spur of the moment because he could not get the other people to do that.  Id. at 62.

On one occasion, Plaintiff and George Swank were staying at the same hotel as ABB contractors and they ate dinner at the same table with some ABB contractors.  Plaintiff Dep. at 141-44.  The next day, Ted Miller verbally admonished or reprimanded the Plaintiff and George Swank not to socialize with ABB contractors.  Id.  Also, during the week of January 15, 2001, in Jacksonville, Florida, Miller observed the Plaintiff talking with one ABB contractor as he instructed the Plaintiff how to "defrag her computer" (or put files in certain places so the computer will run faster).  Id. at 122-23.  On or about February 6-8, 2001, Tina King observed the Plaintiff on a job site at Greensboro, NC.  King wrote a memorandum to Miller dated February 12, 2001, wherein she suggested that Plaintiff's performance was not satisfactory.  King's Trip Report, attached to Miller Supp. Aff. at pp. 29-36.  In his affidavit, Miller referred to Tina King's report and noted that "after conducting and training on a number of tests Ms. Gauny was still having difficulty conducting tests."  Miller Supp. Aff. at p. 3.

During the EEO Investigation, USPS employee Hoffman was asked to rate the Plaintiff's performance on job assignments that he gave her.  Hoffman stated that, "Ms. Gauny had a very good work ethic and was not afraid to tackle an assignment.  Her computer skills were limited but she was

willing to try. She asked questions when unsure and made adjustments when told." Hoffman Aff.

At ¶ 9. Hoffman continued to request that Plaintiff work on his USPS job sites, and she worked her

last one on or about July of 2001. Plaintiff Dep. at 74-77. Plaintiff was asked to work on a job in

Manhattan in September of 2001, but she declined because she had found other employment. Id. at

75-77.

**E.    Plaintiff's Termination**

On February 24, 2001, Careen Hunt with Adecco telephoned the Plaintiff to advise her that

March 12, 2001, would be her last day due to a budget cut. Plaintiff Dep. at 50-52. No other test

director was terminated due to the budget cut. Id. On February 23, 2001, Miller had emailed Hunt

to notify her that Plaintiff's last day would be March 12, 2001. Id.; Miller Supp. Aff. at p.43.

Miller's email to Hunt advised that the RCS budget had been reduced and that Miller had reviewed

the resumes of the RCS test directors and selected the person with the least experience to remove

from the task order. Miller Supp. Aff. at p.43. Adecco sent a letter dated February 26, 2001, to the

Plaintiff to confirm that her current task order would be closed on March 12, 2001. Ex. 1, Plaintiff's

Response.[7] In May of 2001, Miller advised his boss, Sammy Seals, via email that Miller could no

longer trust the Plaintiff because of her inappropriate relations with the ABB technicians and because

there was suspect data from her tests. Miller Supp. Aff. at p.17. In that same email, Miller urged

Seals that Plaintiff should not be used on any postal tests due to her inappropriate relations with ABB

technicians, the excess work hours claimed on her time sheets, and the suspect data received from

her tests. Id. Plaintiff was never told during the time she worked for Miller that she was falsifying

documents or time sheets. Plaintiff Dep. at 173-74.

---

[7] Document #41, Part 2.

-8-

After receiving notice that her last day would be March 12, 2001, Plaintiff telephoned Miller to ask the reason. Miller told the Plaintiff that the reason she was let go was due to a budget cut and because she was the test director with the least mechanical inspection experience. Plaintiff Dep. at 145, 150. Miller did *not* tell the Plaintiff that she was let go due to fraternizing with ABB contractors, but Jim Owens told the Plaintiff that Miller had said that was the reason. Id. at 137-38,145. After March 12, 2001, Mark Hoffman continued to request that the Plaintiff work on his USPS test sites, and she did so on several occasions. Plaintiff Dep. at 72-73. Hoffman knew that the Plaintiff had filed a complaint against Miller because Hoffman asked the Plaintiff about it. Id. When Miller learned that Hoffman continued to give the Plaintiff work, Miller telephoned the Plaintiff to ask her if she had called Hoffman to seek work. Id. The Plaintiff answered "yes," and Miller said "we'll see about that." Id.

Hoffman stated that Miller had requested that Hoffman not utilize the Plaintiff on further jobs but that Hoffman ignored the request because Plaintiff was not on Adecco's "do not rehire" list and Miller did not provide significant justification. Hoffman Aff. at ¶ 8. In Miller's affidavit dated November 19, 2004, he stated that Plaintiff was "removed from the RCS program for: falsifying official test data ..., claiming more hours than actually worked ..., being the least qualified test director ..., and program budget cuts." Miller Supp. Aff. at p. 3. Miller stated that Plaintiff had not been involved with testing as long as Ruel, Swank, and Owens. Id.

### F.     Plaintiff's Complaints About Sexual Harassment and Retaliation

In Santa Ana and Cincinnati, after Miller telephoned the Plaintiff in her hotel room to request that she come over to Miller's room, the Plaintiff told him "no" that is not proper.  On Friday night[8] after the Jacksonville, Florida, robot testing was completed, when Miller telephoned the Plaintiff in her hotel room to invite her to his room she said "no."  She further told Miller that she had told him "no" before and she did not like his request.  Plaintiff Dep. at 57, 127-28.  On March 5, 2001, Plaintiff told Adecco's Careen Hunt over the telephone about Miller's sexual harassment.  Id. at 57.  On March 6, 2001, Plaintiff contacted Adecco's Rebecca Johnson to complain about Miller's conduct and gave a written statement of allegations.  Letter from Adecco to EEOC at p.3.[9]  Johnson immediately contacted the USPS, and someone informed her that the USPS was investigating the matter.  Id.  On March 27, 2001, Plaintiff reported the harassment in person to Sammy Seals, Miller's boss, on a job site in Jacksonville, Florida.  Plaintiff Dep. at 71.  On March 29, 2001, the USPS met with Plaintiff concerning her complaint.  Letter from Adecco to EEOC at p.3.  On or about April 12, 2001, the USPS conducted a "management inquiry" where a counselor interviewed the Plaintiff.  Report of Management Inquiry.[10]

In March of 2001, Plaintiff telephoned the South Carolina EEO to report the situation, but someone told her to contact the EEO for the postal service.  Plaintiff Dep. at 69.  Plaintiff did file a complaint with the EEO about Adecco, but she dropped the case against Adecco.  Id. at 80-81.  In

---

[8] According to a United States' calendar from the year 2001, January 19, 2001, was the Friday of the week of January 15, 2001.  See Google "time and date.com."

[9] Document #33, Part 3 (Ex.2 to Defendant's Motion).

[10] Document #33, Part 9 (Ex.8 to Defendant's Motion).

Plaintiff's attempts to file with the EEO against the Postal Service, she found the process confusing and stated that "she got the runaround for four years" from the government.  Id.  On November 20, 2001, the Plaintiff filed a formal complaint with the EEO Postal Service alleging sexual harassment and retaliation.  Plaintiff's EEO Complaint of Discrimination in the Postal Service.[11]  On December 1, 2005, the USPS issued a Notice of Final Agency Decision to the Plaintiff.  Document #33, Part 13 (Ex. 12 to Defendant's Motion.)  Plaintiff filed the present action on February 17, 2006.

### III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

---

[11] Document #33, Part 11 ( Ex. 10 to Defendant's Motion).

judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves").  To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings.  Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any."  Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.  Rule 56 does not impose upon the court a duty to sift through the record in search of evidence to support a litigant's arguments on summary judgment. Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994); Malina v. Baltimore Gas & Elec., 18 F.Supp.2d 596, 604 (D.Md. 1998); Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 215 (4th Cir. 1993), cert. denied sub nom, Price v. City of Charlotte, 420 U.S. 1116 (1997).

## IV.    DISCUSSION

### A.    Sexual Discrimination / Hostile Work Environment – the 45 Day Rule

Defendant moves for summary judgment on the ground that Plaintiff did not timely make initial contact with an EEO counselor.  Federal employees have 45 days after the discriminatory act to make initial contact with an agency EEO counselor to try to informally resolve the matter.  See 29 C.F.R. § 1614.105(a)(1).  The Defendant argues that Miller's last unwelcome sexual overture occurred as late as January 16, 2001, and that Plaintiff did not make a complaint until March 6, 2001, and therefore more than 45 days had passed.  The Defendant urges the court to dismiss the Plaintiff's complaint on the ground that she did not timely exhaust administrative remedies.

Plaintiff argues that she "made her complaints to Adecco 49 days after the last day of harassment."  Plaintiff's Response at 9.  It appears that Plaintiff may have calculated 49 days from the last date of in-person harassment by Miller on January 16, 2001, to her phone call to Adecco's Careen Hunt on March 5, 2001, wherein she complained about the harassment.  Plaintiff further argues that "Plaintiff clearly testified that Mr. Miller again called her at her home in February to talk about his wife."  Id.  Plaintiff argues that her March 5, 2001, complaint to Hunt was well within 45 days of the last telephone call that Miller made to her home in February of 2001.

From a review of the record, the court finds the following facts to be relevant to the 45 Day Rule:

•    After receiving the telephone call from Hunt that she would be terminated (February 24, 2001), Plaintiff telephoned Miller to ask the reason.  Miller told Plaintiff "budget cut" and "mechanical inspection" and then hung up the telephone when the Plaintiff stated "that's not the reason why."  Plaintiff Dep. at 151.

•    On March 5, 2001, Plaintiff told Adecco's Careen Hunt over the telephone about Miller's sexual harassment.

-13-

- On March 6, 2001, Plaintiff contacted Adecco's Rebecca Johnson to complain about Miller's conduct and gave a written statement of allegations. Letter from Adecco to EEOC at p.3.

- According to a United States' calendar from the year 2001, January 19, 2001, was the Friday of the week of January 15, 2001.

- Plaintiff testified that the Friday night during the week of January 15, 2001, Miller telephoned her hotel room to invite her to his room. Plaintiff Dep. at 120, 127.

- Plaintiff recalled that Miller called her at home at least once a month in between jobs. Plaintiff Dep. at 58. The Plaintiff moved to Myrtle Beach, South Carolina, in December of 2000, and after that date Miller called the Plaintiff twice at her home. Id. at 59.

- Plaintiff recalled that Miller called her home at end of January 2001 or beginning of February 2001, to tell her that she did a great job in Jacksonville, that his wife had left but she was coming back and they were going to work out their marriage. Id. at 109-111.

Assuming, for the sake of argument, Miller's actions amount to sexual harassment, Miller called plaintiff in early February 2001 and discussed his marital situation.[12] Also, the last time Miller invited plaintiff to his hotel room was January 19, 2001. Plaintiff reported the alleged harassment/retaliation to Careen Hunt on March 5, 2001, and then to Rebecca Johnson on March 6, 2001. Therefore, in the light most favorable to the Plaintiff, she reported the harassment within the forty-five day window.

### B.    Sexual Discrimination / Hostile Work Environment

Plaintiff claims that Miller's actions subjected her to a hostile work environment based upon her sex. To establish a hostile work environment claim, Plaintiff must present evidence to prove the following elements: 1) she was subjected to unwelcome conduct in a work related setting; 2) the conduct complained of was based on her sex; 3) the conduct was sufficiently severe or pervasive to

---

[12] Plaintiff's reliance on her telephone call to Miller in February 2001 is misplaced. She instigated the call and in the light most favorable to her, he would not discuss her accusations.

-14-

alter her conditions of employment and to create an abusive work environment; and 4) the conduct

is imputable on some factual basis to her employer.  Ocheltree v. Scollon Productions, Inc., 335 F.3d

325, 331 (4th Cir.2003) (en banc); Spicer v. Com.of Va. Dep't of Corrections, 66 F.3d 705, 710 (4th

Cir.1995) (en banc); Brown v. Perry, 184 F.3d 388, 393 (4th Cir.1999).

Defendant moves for summary judgment on elements three and four.  Defendant argues that

Miller's alleged telephone calls to Plaintiff's hotel rooms were three isolated incidents asking the

Plaintiff "to drink wine, watch a movie, and get to know each other better"and that there is no

corroborating evidence or witnesses that the phone calls actually happened.  Defendant points out

that Plaintiff does *not* claim that Miller ever touched her inappropriately, that her work was affected

by Miller's overtures, or that anyone made remarks demeaning to women or physically threatening.

Defendant argues that as a matter of law the alleged conduct was not severe or pervasive enough to

create an abusive working environment.  Plaintiff argues that Miller's comments were not too far

apart and that his comments affected her ability to be comfortable in her job.  Plaintiff's Response

at 12.  Plaintiff argues that Miller's three propositions happened while Plaintiff and Miller were on

work sites traveling for their jobs, and, therefore, any time Miller was at a work site his presence

created a hostile work environment for Plaintiff.  Id. at 11.

To qualify as severe and pervasive for purposes of Title VII, the harassment must be

objectively and subjectively severe or pervasive as to alter the conditions of plaintiff's employment

and render the workplace abusive.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998);

E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008); Hartsell v. Duplex Products, 123

F.3d 766, 773 (4th Cir. 1997).  To be objectively offensive, the conduct must create "an environment

that a reasonable person would find hostile or abusive."  Harris v. Forklift Sys., Inc., 510 U.S. 17,

21-22 (1993).  The Fourth Circuit has utilized an approach evaluating all of the circumstances in determining whether conduct was objectively abusive, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333 (4ᵗʰ Cir. 2003).  The objective inquiry cannot be a mathematically precise test and no single factor is dispositive.  E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4ᵗʰ Cir. 2008).  This legal standard is designed to filter out complaints attacking "'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Ocheltree, 335 F.3d at 333 (quoting Faragher, 524 U.S. at 788).   A workplace is sufficiently severe or pervasive when it "is permeated with discriminatory intimidation, ridicule, and insult."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 20 (1993)(internal quotation omitted).  Title VII forbids "only behavior so objectively offensive as to alter the 'conditions' of the victim's employment."  Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998).  The conduct must be sufficiently severe and pervasive to "ensure that courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory conditions of confinement."  Id.  As the Fourth Circuit Court of Appeals recently explained, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test. ... The task on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion."  E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d at 315-16.

The incidents at issue in this case occurred over approximately six months.  There were no physical advances made.  There was no ridicule or conduct committed in the presence of others.

-16-

There were not explicit threats made.  There was no explicit lewd talk or specific request for sexual activity.  He did not attempt to enter her hotel room, touch her inappropriately, or engage in conduct that was physically threatening.   Plaintiff presents nothing to suggest that Miller's actions unreasonably interfered with her work performance.  She asserts that it made her uncomfortable. Considering all of the circumstances, the conduct was more sporadic than frequent.  The requests to the Plaintiff were made outside of work hours and at the end of the trip on each occasions.  When she declined his invitations, he did not argue or become persistent.  In the light most favorable to the Plaintiff, Miller clearly shared personal matters with the Plaintiff relating to his marital situation and attempted to engage the Plaintiff in a situation where sexual relations could materialize.  While, taken in the light most favorable to the Plaintiff, Miller's conduct was clearly inappropriate, it does not rise to the level of severe and pervasive as contemplated by Title VII.  Therefore, Plaintiff fails to meet her burden of presenting evidence of conduct sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment, and thus fails to establish a prima facie case of sexual harassment.[13]

---

[13] Assuming, for the sake of argument, Plaintiff has presented a material issue of fact as to the third element of her claim, the court notes that it does not believe that the USPS can avail itself of the affirmative defense to liability.  Defendant argues that the Plaintiff has failed to show the fourth element of her claim that Miller's actions should be imputed to the USPS because the USPS can establish the affirmative defense to vicarious liability.  "In the case of harassment by a supervisor 'with immediate (or sucessively higher) authority over the employee,' an employer may be found vicariously liable under the standards established in Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765 ... and Faragher v. City of Boca Raton, 524 U.S. at 807-08 ... ." Ocheltree, 335 F.3d at 334.  The United States Supreme Court explained that *where no tangible employment action is taken* a defending employer may raise an affirmative defense to liability or damages by proving by a preponderance of the evidence: (a) the employer used reasonable care to prevent and promptly correct any sexually harassing behavior, and (b) the plaintiff unreasonably failed to take  advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, 524 U.S. at 807 (emphasis added).  Faragher states that "[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action,

-17-

### C.     Retaliation

Plaintiff brings a claim for retaliation in violation of Title VII.  Title 42, Section 2000e-3(a)

of the United States Code provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees . . . because he has opposed any practice made
> an unlawful employment practice by this subchapter, or because he has made
> a charge, testified, assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in protected

activity, (2) the employer took adverse employment action against her, and (3) a causal connection

existed between the protected activity and the adverse action.  Matvia v. Bald Head Island

Management, Inc., 259 F.3d 261, 271 (4th Cir. 2001).  In order to establish the requisite causal

connection, plaintiff must proffer evidence which establishes that she would not have been

terminated but for her protected activity.  Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 755

(4th Cir. 1996).  If a plaintiff can show a prima facie case, the burden shifts to the employer to rebut

the presumption by proffering a non-retaliatory reason for its action.  Baqir v. Principi, 434 F.3d 733,

747 (4th Cir. 2006).  If the employer does so, then a plaintiff must show that the employer's proffered

reason is pretextual.  Id.

The Plaintiff alleges that she engaged in protected activity when she submitted a written

complaint about Miller's sexual harassment.  Compl. at ¶ 81.  The record shows that the Plaintiff

complained to her employer of the harassment on March 5, 2001, during a telephone call to Hunt and

---

such as discharge, demotion, or undesirable reassignment."  Id. at 808.  Here, if the Plaintiff could
prove that her work environment was abusive, severe and pervasive (the third element), in the light
most favorable to the Plaintiff, she can show that Miller's reaction to her rejections of his sexual
advances culminated in his deciding to lay her off of the RCS program which constituted a tangible
employment action.

that on March 6, 2001, the Plaintiff contacted Johnson to submit a written statement of allegations concerning Miller's conduct. Letter from Adecco to EEOC at p.3. There seems to be no dispute that Plaintiff's complaints on March 5 and 6, 2001, were protected activity.[14] There also seems to be no dispute that Miller's action of removing Plaintiff from the RCS program was an adverse employment action against the Plaintiff.[15] Miller actually took the adverse employment action on February 23, 2001 (see Ex.1, Defendant's Motion at p. 43), but the Plaintiff found out about his action on February 24, 2001.

The Defendant moves for summary judgment because the Plaintiff cannot meet the prima facie case of retaliation since there is no evidence of the third element of a causal connection. The Defendant argues that the adverse employment action taken (the decision to lay off the Plaintiff) could not have been due to the Plaintiff's complaining of sexual harassment because the complaining occurred *after* the decision to lay her off. The Defendant relies on several cases which stand for the proposition that the decision maker must have been aware of a plaintiff's prior protected activity to

---

[14] The court believes that Plaintiff's complaints of discrimination on March 5 and 6, 2001, were "opposition" protected activity as opposed to "participation" clause activity because she had not yet filed a formal charge of discrimination against her employer. "To qualify as opposition activity an employee need not engage in the formal process of adjudicating a discrimination claim." Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998).

[15] The Supreme Court recently clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern & Santa Fe Rwy. v. White, 26 S.Ct. 2405, 2412-13 (2006). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 2414 (emphasis added). Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (quotation marks and citations omitted).

establish causation.  See Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).  See also Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998) ("Knowledge of a charge [of discrimination] is essential to a retaliation claim.").  The Defendant is correct that the decision to lay off the Plaintiff happened before the Plaintiff reported Miller's conduct to Hunt and Johnson.  Thus, there is no causal connection between the adverse employment action – the decision to terminate her assignment – and her protected activity – plaintiff's complaints to Hunt and Johnson.

However, this does not end our analysis.  The Plaintiff appears to argue that her informal complaints to Miller constituted protected activity.  Courts are divided on whether or not refusal to submit to a supervisor's sexual advances constitutes "protected activity."  The undersigned is unaware of any circuit court that has ruled on the issue.  However, a number of district courts have held that rejecting a sexual advance is protected activity.  See McCulley v. Allstate Technical Serv., No. Civ. A. 04-0115-WS-B, 2005 WL 1475314 (S.D. Ala. June 21, 2005); Laurin v. Pokoik, No. 02 Civ. 1938(LMM), 2005 WL 911429 (S.D.N.Y. April 18, 2005); Roberts v. County of Cook, No. 01 C 9373, 2004 WL 1088230 (N.D. Ill. May 12, 2004); Black v. City & County of Honolulu, 112 F.Supp.2d 1041 (D.Haw. 2000); Fleming v. South Carolina Dep't of Corr., 952 F.Supp. 283 (D.S.C. 1996); EEOC v. Domino's Pizza, 909 F.Supp. 1529 (M.D. Fla. 1995).  And, a number of courts have held that is does not amount to protected activity.  Del Castillo v. Pathmark Stores, Inc., 941 F.Supp. 437 (S.D.N.Y. 1996); Fitzgerald v. Henderson, 36 F.Supp.2d 490 (N.D.N.Y. 1998); Farfaras v. Citizens Bank & Trust, No. 01 C 8720, 2004 WL 2034077 (N.D. Ill. Aug. 30, 2004); Rachel-Smith v. FTData, Inc., 247 F.Supp.2d 734 (D.Md. 2003).[16]

_____

[16]  This is not meant to be an exhaustive list of every court that has addressed the issue.

The retaliation statute protects an employee from an employer's retaliation against the employee's opposition to an unlawful employment practice. An oppositional retaliation claimant need not show the underlying claim of discrimination is in fact meritorious. See Ross v. Communications Satellite Corp., 759 F.2d 355, n.1 (4th Cir. 1985). She need only show a reasonable belief of unlawful employment practice. Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003). Under the facts and circumstances of this case, Plaintiff presents sufficient facts to support a reasonable belief that she opposed an unlawful employment practice. There is evidence in the record that the Plaintiff on three different occasions rejected Miller's sexual advances using words to the effect of "no, you are my supervisor, it would not be proper" and again told him no on two subsequent occasions. Miller responded the last time by hanging up the phone and acting cold towards her the next day. Under the circumstances of this case, her rejections to his advances qualify as protected oppositional activity. Cf. Laughlin, 149 F.3d at 259 (voicing one's opinion in order to bring attention to an employer's discriminatory activity).

Additionally, after the Plaintiff made the complaints on March 5 and 6, 2001, and after Miller was actually aware of her complaints, Miller began sending emails, or otherwise contacting USPS supervisors in an effort to ensure that the Plaintiff would not be hired to work on future USPS programs. Miller Supp. Aff. at pp.16-17; Hoffman Aff. ¶ 8. The efforts by Miller to ensure that the Plaintiff was not asked by other USPS supervisors to work on USPS programs qualify as an adverse employment action. Burlington Northern & Sante Fe Rwy, 26 S.Ct. 2412-13. Accordingly, the Plaintiff has presented a material issue of fact of a prima facie case of retaliation by showing protected activity (Plaintiff's reporting the conduct on March 5 and 6, 2001), adverse employment

action (Miller's campaign to ensure that the Plaintiff was not hired to work on other USPS programs), and a casual connection due to the close proximity in time.

Because the Plaintiff presents a prima facie case of retaliation, the burden shifts to Defendant to produce a legitimate, non-retaliatory reason for the adverse employment actions.  There is evidence in the record that Miller's adverse employment actions were taken because of: budget cuts, Plaintiff was not as qualified as the other test directors, Miller learned from Tina King that the Plaintiff's job performance was poor, Miller believed that the Plaintiff fraternized with an ABB contractor in violation of an unwritten rule, Miller believed that the Plaintiff had falsified work hours and test data, and Miller no longer trusted the Plaintiff's job performance and believed that the USPS should not use her services on any programs.  This is sufficient to satisfy its burden of production, and the burden shifts back to Plaintiff to produce evidence that Defendant's reason is not its true reason, but is pretext for a retaliatory reason.

It is Plaintiff's burden ultimately to show that retaliation for protected activity was the motivating factor in the adverse employment actions.  It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination (or adverse employment action)."[17]  Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir. 2000) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998)); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence

_____

[17]  "Proof that the employer's proffered reasons are unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000).  "It is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [her] explanation of intentional race discrimination." Id.

-22-

of employment decisions made by firms charged with employment discrimination ...." (internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer").  The court finds that there is evidence in the record from which a reasonable juror could conclude the motivating factor for selecting the Plaintiff to be laid off was because she refused to submit to Miller's requests.  While it is true that from the outset Miller claimed that Plaintiff was selected for termination due to a budget cut and she was the least experienced, Miller told Plaintiff in December of 2000 that she and Owens would *not* be laid off.  There is also evidence in the record that the motivating factor for Miller's campaign to ensure the Plaintiff would not be requested to work on other USPS programs was because Plaintiff had reported to management about Miller's harassing actions.  Of course, Miller may have truly believed that the Plaintiff's job performance was poor and he did not want other USPS programs to hire a person that he did not trust.  However, Miller did not suggest that the Plaintiff had falsified time records by claiming excess hours or suggest that she falsified test data until after Plaintiff had reported to management about Miller's sexual harassment.  Several other facts may tend to show pretext: Miller never reprimanded the Plaintiff about reporting excess hours or falsifying test data, Owens had fraternized with ABB contractors but Miller continued to request him for Miller's programs, and Hoffman seemed satisfied with Plaintiff's job performance.  Accordingly, the court recommends that the motion for summary judgment be denied on the retaliation claim.

## V.     CONCLUSION

In light of the above analysis, it is recommended that Defendant's Motion for Summary Judgment (Document # 33) be granted in part and denied in part as set forth above.


s/Thomas E. Rogers, III

August 1, 2008                              Thomas E. Rogers, III
Florence, South Carolina                    United States Magistrate Judge



**The parties' attention is directed to the important notice contained on the following page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk

United States District Court

P. O. Box 2317

Florence, South Carolina 29503

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).